IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

CHRISTOPHER ODDY,                )      CIVIL NO. 11-00715 LEK-KSC
                                 )
        Petitioner,              )
                                 )
    vs.                          )
                                 )
JAHNA MORRIS,                    )
                                 )
        Respondent.              )
_____)


**ORDER GRANTING EMERGENCY VERIFIED PETITION FOR RETURN
OF CHILDREN TO THE UNITED KINGDOM PURSUANT TO 42 U.S.C. § 11601**

        Before the Court is Petitioner Christopher Oddy's
("Petitioner") Emergency Verified Petition for Return of Children
to the United Kingdom Pursuant to 42 U.S.C. § 11601 ("Petition"),
filed November 29, 2011.  The Court held a hearing on the matter
on February 10, 2012.  Appearing on behalf of Petitioner were
Stephen Cullen, Esq., and Kelly Powers, Esq., and appearing on
behalf of Respondent Jahna Morris ("Respondent") was William
Harrison, Esq.  The Court heard testimony from Petitioner and
Respondent at the hearing, and received Petitioner's Exhibits 1-
13 and Respondent's Exhibits 14-29, 33, and 35-36.

        Upon considering the Petition, the Convention on the
Civil Aspects of International Child Abduction, done at the Hague
on October 25, 1980 (the "Hague Convention"), the International
Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 et
seq., and the arguments and evidence presented at the hearing,

the Petition is GRANTED and the Court HEREBY ORDERS as follows:

1.    The parties are directed to meet and confer by **February 24, 2012** regarding arrangements for the return of the minor children, S.O., born in 2004, and D.M.O., born in 2007 ("the children"), to the United Kingdom.  If the parties are not able to reach a mutually agreed upon arrangement for repatriation of the children to the United Kingdom, Respondent may herself or through her attorney, make arrangements to return the children to the United Kingdom by **April 24, 2012**.

2.    Respondent shall fully cooperate in the coordination and return of the children to the United Kingdom, including providing the children's passports and any other documents necessary for international air travel.[1]  Respondent is responsible for the cost of the children's transportation to Petitioner's home in the United Kingdom.  See 42 U.S.C. § 11607(b)(3) ("Any court ordering the return of a child . . . shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.").

---

[1] The Court will retain the children's passports until notified by the parties that the passports should be released for the children's scheduled departure to the United Kingdom.

2

3.     Respondent is admonished that failure to comply with the terms of this order shall constitute contempt of court and may result in imposition of a fine and/or imprisonment.

4.     The United States Marshals Service is directed to assist in the execution of this Order as necessary, and the United States Marshals Service may enlist the assistance of other law enforcement authorities as necessary to aid in any respect to secure the safe return of the children to the United Kingdom.

5.     The parties may mutually agree upon alternative arrangements (including the sharing or shifting of the costs of the children's transportation) for the return of the children to the United Kingdom by written stipulation and proposed order filed with the Court.

## DISCUSSION

This Court has jurisdiction over this matter pursuant to ICARA § 11603 because this case involves the retention of two children under the age of sixteen in the United States from their alleged habitual residence of the United Kingdom, and because the children are currently located within the jurisdiction of this Court in the District of Hawai'i.

## I.     ICARA and the Hague Convention

The Hague Convention was adopted in 1980 and its goal is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and . . . to ensure that

rights of custody and of access under the law of one Contracting

State are effectively respected in the other Contracting States."

Hague Convention, art. 1. Both the United States and the United

Kingdom are signatories to the Convention; the United States

implemented the Convention through the enactment of ICARA, 42

U.S.C. § 11601 <u>et seq</u>.

> In drafting the Convention's provisions, the
> Conference attempted to address a particular type
> of "kidnapping" scenario: one in which a person,
> usually a parent, removes a child to, or retains a
> child in, a country that is not the child's
> habitual residence in order "to obtain a right of
> custody from the authorities of the country to
> which the child has been taken." The Convention
> seeks to eliminate the motivation for such actions
> by requiring the court of the "requested State,"
> or the country to which the child has been
> removed, to return a wrongfully removed or
> retained child to his or her country of habitual
> residence, unless the removing party establishes
> an exception or defense to return. Hague
> Convention, art. 12. Unless and until there is a
> determination that the child need not be returned,
> "the judicial or administrative authorities of the
> Contracting State to which the child has been
> removed or in which it has been retained shall not
> decide on the merits of rights of custody." <u>Id.</u>
> art. 16. "[T]he Convention rests implicitly upon
> the principle that any debate on the merits of the
> question, <u>i.e.</u> of custody rights, should take
> place before the competent authorities in the
> State where the child had its habitual residence
> prior to its removal."

<u>Asvesta v. Petroutsas</u>, 580 F.3d 1000, 1003-04 (9th Cir. 2009)

(some citations omitted).

Petitioner has the burden of establishing that

Respondent's removal and/or retention of the children was

"wrongful."  Under Article 3 of the Hague Convention, a removal

is wrongful where:

> a) it is in breach of rights of custody attributed
> to a person, an institution or any other body,
> either jointly or alone, under the law of the
> State in which the Child was habitually resident
> immediately before the removal or retention; and
> b) at the time of removal or retention those
> rights were actually exercised, either jointly or
> alone, or would have been so exercised but for the
> removal or retention.

Hague Convention, art. 3; <u>see also</u> <u>Papakosmas v. Papakosmas</u>, 483

F.3d 617, 622 (9th Cir. 2007).

In applying this provision, the Court must answer four

questions:

> (1) When did the removal or retention at issue
> take place? (2) Immediately prior to the removal
> or retention, in which state was the child
> habitually resident? (3) Did the removal or
> retention breach the rights of custody attributed
> to the petitioner under the law of the habitual
> residence? (4) Was the petitioner exercising those
> rights at the time of the removal or retention?

<u>Mozes v. Mozes</u>, 239 F.3d 1067, 1070 (9th Cir. 2001).

## II. **Petitioner's Prima Facie Case**

Petitioner has the burden of proving by a preponderance

of the evidence that Respondent's retention of the children in

the United States was wrongful under the Convention.  42 U.S.C. §

11603(e)(1)(A).  Specifically, Petitioner must show that: (1) the

children were habitually resident in the United Kingdom at the

time of the retention; (2) the retention was in breach of

Petitioner's custody rights under United Kingdom law; and (3)

Petitioner was exercising those rights at the time of retention.

## A. Factual Background

Petitioner and Respondent were married on April 11, 2003 in the United Kingdom; Petitioner is a citizen of the United Kingdom and Respondent is a citizen of the United States. The children were born in the County of Poole, United Kingdom, and are citizens of the United Kingdom and the United States. [Petition at ¶¶ 4-6.] Petitioner and Respondent were divorced in the Bournemouth County Court in the United Kingdom on October 7, 2009. The Bournemouth County Court did not make any orders with respect to parental responsibility, residence or contact at the time of the parties' divorce. [Id. at ¶¶ 7-8.] Petitioner states that, under English law, specifically the Children Act 1989, he and Respondent share equally parental responsibility of both children. [Id. at ¶ 9.]

According to Petitioner, the following acts took place in 2010 and 2011:

> 10. On March 17, 2010, the Mother [Respondent] had filed an application in the United Kingdom's High Court of Justice, Family Division, Bournemouth District Registry (the "English Court"), requesting permission to permanently remove the children from the United Kingdom. A trial was scheduled for December 2 and 3, 2010 on the Mother's application.
> 11. As a result of the Mother's application for permanent removal having been filed, the English Court ordered that a report be prepared by the Children and Family Reporter, Mrs. Pat Holmes. Mrs. Holmes prepared her report dated October 8, 2010 and submitted it to the English Court.

12.  After the report was submitted to the English Court, a hearing was held before His Honour Judge Meston Q.C. on October 25, 2010. Judge Meston had reviewed both parties' submissions, reviewed the report prepared by the Children and Family Reporter and had heard from counsel for both parties with respect to agreements reached between the parties.

13.  At the hearing on October 25, 2010, the English Court issued a Residence and Contact Order on October 25, 2010.  A copy of said Residence and Contact Order is attached hereto and incorporated herein as Exhibit D.

14.  The Residence and Contact Order provides that the children shall reside with the Mother in the United Kingdom and sets out a detailed and extensive schedule of contact for the Father in the United Kingdom.  *See*, Exhibit D.  No order was made with respect to the parents' ex lege joint parental responsibility pursuant to the Children Act 1989.

15.  The Residence and Contact Order provides that the Mother's application to permanently remove the children from the United Kingdom would be withdrawn and that the trial on her application scheduled for December 2-3, 2010 be vacated.  *See*, Exhibit D.

16.  Thereafter the parties functioned pursuant to the Residence and Contact Order, which did not address the issue of parental responsibility, and both parties continued to share parental responsibility under the Children Act.  Because the parties are both the parents of the children and no court has suspended or otherwise terminated either party's parental responsibility, the parties continue to share parental responsibility for the children under the Children Act by operation of law.  *See*, Exhibits C, D.

17.  The Residence and Contact Order provides as follows with respect to removing the children from the United Kingdom: "WARNING: Where a Residence Order is in force no person may cause the child to be known by a new surname or <u>remove the child from the United Kingdom without written consent of every person with parental responsibility for the child or the leave of court</u>.  However, this does not prevent the removal

of the child for a period of less than one month
by the person in whose favor the Residence Order
is made (Sections 13(1) and (2) Children Act
1989).  It may be a criminal offence under the
Child Abduction Act 1984 to remove the child from
the United Kingdom without the leave of the
court."  (Emphasis added).
     18.  After the issuance of the Residence and
Contact Order, the parties and children continued
to reside in the United Kingdom and followed the
schedule for residence and contact set out in the
Residence and Contact Order.
     19.  The Father was scheduled to have his
regularly scheduled time with the children on July
30, 2011 and was also scheduled to begin his
summer holiday time with the children on August 1,
2011.  When the Father went to pick up the
children on July 30, 2011, he discovered that the
Mother's home was completely empty.
     20.  Immediately upon discovering that the
Mother's home was completely empty, the Father
began searching for the children and reaching out
to family and friends for help locating his
daughters.  The Father learned from one of the
Mother's friends that the Mother had taken the
children to Hawaii and later confirmed from other
friends and relatives that the Mother had taken
the children to Hawaii.

[Id. at ¶¶ 10-20 (emphasis in original).]  The testimony and

evidence presented at the hearing supported these facts as

set forth in the Petition.

     The Court finds that Petitioner has established that he

has parental responsibility for the children and did not consent

to their removal from their habitual residence in the United

Kingdom.  Respondent did not obtain leave of court before she

removed the children from the United Kingdom, and, since the

removal of the children, Petitioner has not acquiesced to their

removal or retention.[2]  [Id. at ¶ 26.]  The Court addresses each

element in turn.

**B.  Habitual Residence**

      "[T]he term 'habitual residence' is
intentionally left undefined in the Convention
. . . ."  Papakosmas v. Papakosmas, 483 F.3d 617,
622 (9th Cir. 2007).  However, the Ninth Circuit
has "developed an analytical framework to provide
'intelligibility and consistency' in the
determination of a child's habitual residence."
Id. (quoting Holder v. Holder, 392 F.3d 1009, 1015
(9th Cir. 2004)).  Under this framework, the first
question is "whether there is a settled intention
to abandon a prior habitual residence."  Id.
(citing Mozes, 239 F.3d at 1075).  "One need not
have [the] settled intention [to abandon a prior
habitual residence] at the moment of departure; it
could coalesce during the course of a stay abroad
originally intended to be temporary."  Mozes, 239
F.3d at 1075.  "[O]ne may effectively abandon a
prior habitual residence without intending to
occupy the next one for more than a limited
period."  Id.  "Nor need [a person's] intention be
expressly declared, if it is manifest from one's
actions . . . ."  Id.

      "Second, there must be (A) an actual change
in geography, combined with (B) the passage of an
appreciable period of time . . . sufficient for
acclimatization."  Holder, 392 F.3d at 1015
(citations and internal quotation marks omitted).
"[T]he inquiry is . . . whether the [child's life
has] become firmly rooted in [his] new
surroundings."  Id. at 1019.

Nelson v. Petterle, 782 F. Supp. 2d 1081, 1090-91 (E.D. Cal.

2011).

---

[2] On March 17, 2010, Respondent filed an application to
remove the children permanently from the jurisdiction, but
subsequently agreed to withdraw this application.  [Petitioner's
Exh. 5 (10/28/10 Residence and Contact Order), at 1.]

The Petition states that:

> 24.   The children have both lived their entire lives in the United Kingdom until the Mother removed them from the United Kingdom on or about July 25, 2011 without the Father's consent and in violation of English law.
> 25.   The children have their home, school, extended family and friends in the United Kingdom and were fully involved and integrated in all aspects of daily life and cultural life in the United Kingdom.

[Petition at ¶¶ 24-25.]

Petitioner has shown through the Petition and the evidence presented at the hearing that the United Kingdom was the children's habitual residence at the time of their removal on or about July 30, 2011.  Respondent made no showing in rebuttal with respect to the habitual residence factor.

C.   **Breach of United Kingdom Custody Rights**

Petitioner must show that Respondent's retention of the children was in breach of his rights of custody under United Kingdom law.  The Convention defines "rights of custody" to include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence."  Hague Convention, art. 5.  "Rights of custody" may arise "by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State."  Id., art. 3.

10

> In ascertaining whether there has been a
> wrongful removal or retention within the meaning
> of [the Convention], . . . the [Court] . . . may
> take notice directly of the law of, and of
> judicial or administrative decisions, formally
> [recognized] or not in the State of the habitual
> residence of the child, without recourse to the
> specific procedures for the proof of that law or
> for the recognition of foreign decisions which
> would otherwise be applicable.

Id., art. 14.

The Petition states that, at the time of the removal of the children from the United Kingdom to the United States, Respondent had and continues to have rights of custody under English law pursuant to the Children Act 1989. [Petition at ¶ 39.] Under the Children Act 1989, "[w]here a child's father and mother were married to each other at the time of his birth, they shall each have parental responsibility for the child." [Petition, Exh. C.]

Under the Residence and Contact Order pursuant to the Children Act 1989 in effect between the parties, the children were to reside with Respondent, and had specific periods of court-ordered contact with Petitioner. [Petition, Exh. D (10/25/2010 Residence & Contact Order).] It also states that:

> Where a Residence Order is in force no person may
> cause the child to be known by a new surname or
> remove the child from the United Kingdom without
> written consent of every person with parental
> responsibility for the child or the leave of
> court.  However, this does not prevent the removal
> of the child for a period of less than one month

> by the person in whose favor the Residence Order
> is made (Sections 13(1) and (2) Children Act
> 1989). It may be a criminal offence under the
> Child Abduction Act 1984 to remove the child from
> the United Kingdom without the leave of the court.

[Id.] Although holders of parental responsibility can act independently, § 2(7) of the Children Act 1989 preserves the operation of other statutory provisions such as § 1 of the Child Abduction Act 1984, which requires the consent of more than one person in matters affecting the child, and prohibits parents or guardians from taking a child out of the United Kingdom without the appropriate consent. [Petition, Exh. C.]

Petitioner has shown that Respondent's retention of the children violated his rights of custody under United Kingdom law. Respondent did not rebut this showing.

### D. Petitioner's Exercise of Custody Rights

The retention of a child is wrongful under the Convention only when "b) at the time of . . . retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the . . . retention." Hague Convention, art. 3. "[P]etitioner's burden [on this element] is minimal." Asvesta v. Petroutsas, 580 F.3d 1000, 1018 (9th Cir. 2009).

> [I]f a person has valid custody rights to a child
> under the law of the country of the child's
> habitual residence, that person cannot fail to
> "exercise" those custody rights under the Hague
> Convention short of acts that constitute clear and
> unequivocal abandonment of the child. Once [a

12

court] determines that the parent exercised
custody rights in any manner, [it] should
stop-completely avoiding the question whether the
parent exercised the custody rights well or badly.

Id. (quoting Friedrich v. Friedrich, 78 F.3d 1060, 1066 (6th Cir.
1996)).

The Petition states that, at the time of the removal of
the children, Respondent was actually exercising his custody
rights within the meaning of articles three and five of the
Convention, in that he is the father of the children and has
exercised custody rights over them in the United Kingdom by
caring for the children and fully participating in the children's
lives since their birth.  [Petition at ¶ 40.]

At the hearing, Respondent testified that Petitioner
would often miss scheduled contact time with the children and did
not actually have visitation with them during all of the
available contact time.  Under the totality of the circumstances,
the evidence supports Petitioner's claims that he did not
relinquish any rights under United Kingdom law, and the Court
finds that Petitioner has shown that his rights of custody were
actually exercised or would have been exercised but for the
retention.

In sum, Petitioner has made the requisite showing that
he is entitled to relief.

III.  **Affirmative Defenses**

"In the event that a petitioning party shows that the

child was wrongfully removed or retained, [the Convention] provides certain exceptions to [its] mandate that the child be returned to his or her habitual residence." Asvesta, 580 F.3d at 1004. However, the "exceptions or defenses . . . must [be] narrowly interpret[ed]." Id.

Article 13(b) creates an exception to the return of a child where "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." The "grave risk" defense must be proven by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A).

United States courts have consistently recognized that, like the other exceptions to the return of a child under the Convention, article 13(b)'s exception for grave risk should be "narrowly drawn." In re Adan, 437 F.3d 381, 395 (3d Cir. 2006); see also Blondin v. Dubois, 238 F.3d 153, 162 (2d Cir. 2001) (observing that "grave risk of harm" arises in "situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation"). The United States State Department offers the following guidance on applying this exception:

> (c) Grave risk of harm/intolerable situation.
> Under Article 13(b), a court in its
> discretion need not order a child returned if
> there is a grave risk that return would
> expose the child to physical harm or
> otherwise place the child in an intolerable

14

situation.

This provision was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests. Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination. The person opposing the child's return must show that the risk to the child is grave, not merely serious.

A review of deliberations on the Convention reveals that "intolerable situation" was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State. An example of an "intolerable situation" is one in which a custodial parent sexually abuses the child. If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent then petitions for the child's return under the Convention, the court may deny the petition. Such action would protect the child from being returned to an "intolerable situation" and subjected to a grave risk of psychological harm.

51 Fed. Reg. 10494, 10510 (March 26, 1986).

The Sixth Circuit has held that "grave risk of harm" exists in two situations: (1) when return of the child puts the child in imminent danger prior to resolution of the custody dispute (e.g., returning child to a zone of war, famine, or disease); or (2) where there is serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or

unwilling to give the child adequate protection. <u>Friedrich v.</u>
<u>Friedrich</u>, 78 F.3d 1060, 1068 (6th Cir. 1996). The Seventh and
Eleventh Circuits have rejected this narrower approach, and
concluded instead that the Hague Convention does not place a
burden on a respondent to prove that the habitual residence would
not, or could not protect the child. <u>See</u> <u>Baran v. Beaty</u>, 526
F.3d 1340, 1348 (11th Cir. 2008); <u>Van De Sande v. Van De Sande</u>,
431 F.3d 567, 571 (7th Cir. 2005). The Ninth Circuit has cited
other language from <u>Friedrich</u> approvingly, but it does not appear
to have conclusively adopted this standard in full.[3] In any
event, the Ninth Circuit has provided the following guidance:

_____

[3] One Ninth Circuit decision questions the Sixth Circuit's
standard as follows, but does not reach the issue of whether to
apply this standard in this Circuit:

> At least one court has held that a petitioner may
> defeat removal by showing that courts "in the
> country of habitual residence, for whatever
> reason, may be incapable or unwilling to give the
> child adequate protection" from a severely abusive
> or neglectful parent. <u>Friedrich</u>, 78 F.3d at 1069.
> This statement is in some tension with the theory
> of the Hague Convention and our holding that the
> grave risk inquiry focuses only on "the period
> necessary to obtain a custody determination."
> <u>Gaudin</u>, 415 F.3d at 1037. But we need not dwell
> on the question of whether to adopt the Sixth
> Circuit's rule as our own because the evidence
> presented by Richard comes nowhere close to
> raising the issue. Richard's speculative and
> unsubstantiated concern about the fairness of
> Panama's courts falls woefully short of the
> showing required by the Sixth Circuit in
> <u>Friedrich</u>.

<u>Cuellar v. Joyce</u>, 596 F.3d 505, 510 (9th Cir. 2010).

16

"[T]he exception for grave harm to the child is
not license for a court in the abducted-to country
to speculate on where the child would be
happiest." <u>Friedrich v. Friedrich</u>, 78 F.3d 1060,
1068 (6th Cir. 1996). Rather, the question is
whether the child would suffer "serious abuse,"
<u>Blondin v. Dubois</u> (<u>Blondin II</u>), 238 F.3d 153, 163
n.11 (2d Cir. 2001), that is "a great deal more
than minimal." <u>Walsh v. Walsh</u>, 221 F.3d 204, 218
(1st Cir. 2000).

. . .

The grave-risk exception to the return remedy
was, like the other exceptions, "drawn very
narrowly lest [its] application undermine the
express purposes of the Convention-to effect the
prompt return of abducted children." <u>Department
of State: Hague International Child Abduction
Convention; Text and Legal Analysis</u>, 51 Fed. Reg.
10,494, 10,509 (Mar. 26, 1986) [hereinafter "State
Department Report"]. The risk must be "grave, not
merely serious," <u>id.</u> at 10,510, and must be proven
by clear and convincing evidence, 42 U.S.C. §
11603(e)(2)(A). Moreover, because the Hague
Convention provides only a provisional, short-term
remedy in order to permit long-term custody
proceedings to take place in the home
jurisdiction, the grave-risk inquiry should be
concerned only with the degree of harm that could
occur in the immediate future. Because
psychological harm is often cumulative, especially
in the absence of physical abuse or extreme
maltreatment, even a living situation capable of
causing grave psychological harm over the full
course of a child's development is not necessarily
likely to do so during the period necessary to
obtain a custody determination.

On remand, then, the district court must
decide-without deferring to the findings of the
Hawaii state courts-whether this narrow exception
is met under present circumstances. If it is, the
court must proceed to consider whether that risk
can be minimized or eliminated through some
alternative remedy.

<u>Gaudin v. Remis</u>, 415 F.3d 1028, 1035-37 (9th Cir. 2005).

Based on the evidence presented, the Court finds that Respondent has not met her burden of establishing that the children are at grave risk of harm if returned to the United Kingdom. The evidence that Petitioner was physically, verbally, and mentally abusive to Respondent during the course of their marriage and thereafter is troubling, indeed. Respondent testified regarding Petitioner's history of alcohol abuse and anger management issues, and its effect on the family. The Court finds Respondent's testimony credible with respect to her fear of Petitioner's angry outbursts and threats of violence against her and her friends.

Respondent also presented credible evidence that the children witnessed verbal confrontations and disagreements between their parents, which may have affected the children psychologically and emotionally. Specifically, a 2006 incident in which Petitioner physically kicked and struck Respondent in front of the oldest child and destroyed household property, and subsequently pleaded guilty to breaching the peace and criminal property damage, and an April 2011 incident at Waterloo Station in which Petitioner verbally threatened Respondent and a third-party in front of the children during a custody exchange.

The Court also heard testimony regarding an April 2011 incident during which the younger child was injured while in Petitioner's care. The parties dispute the cause and severity of

the injury to the child's elbow.  Respondent maintains that
Petitioner yanked the child up by her arm as she resisted having
her diaper changed; Petitioner contends the injury was the result
of normal play with the children.  Respondent faults Petitioner
for waiting several hours between the time of the injury and when
he eventually sought medical care for the child the next morning.
A hospital record indicates the following history of the
presenting complaint: "[p]laying when getting nappy changed L.
arm around her elbow very painful and not moving it, very upset
in triage."  [Respondent's Exh. 14 (4/20/11 Hospital Record).]
The Court finds that the parties' respective views of the
incident are reconcilable based on the testimony and evidence
presented at the hearing, and credits each.  Respondent also
recounted another recent incident in which the older child became
ill while playing outside with Petitioner during poor weather
conditions, and detailed her concerns regarding Petitioner's
parenting capabilities.

It is clear that the parties' relationship was troubled
both during and after their marriage, when Petitioner was abusive
toward Respondent, and that Respondent believed that matters were
deteriorating in the months before she removed the children.  The
Court, however, finds that, as troubling as this behavior may be,
Respondent has not established for purposes of the article 13(b)
analysis that the children would suffer "serious abuse that is a

great deal more than minimal." <u>Gaudin</u>, 415 F.3d at 1035
(citations omitted); <u>see also</u> <u>Whallon v. Lynn</u>, 230 F.3d 450, 460
(1st Cir. 2000) (stating that a husband's "verbal abuse and an
incident of physical shoving" directed at his wife, while
regrettable, was insufficient to establish a "grave risk" of harm
to the child, especially where there was no allegation that the
father had ever abused the child, either physically or
psychologically); <u>Maurizio R. v. L.C.</u>, 135 Cal. Rptr. 3d 93, 108-
10 (Cal. App. 2 Dist. 2011) (surveying cases).

The Court has considered the alleged psychological harm
suffered by the children and finds that, while regrettable and
unacceptable, any such harm does not to rise to the level
required for sustaining an article 13(b) exception. <u>See</u> <u>Whallon</u>,
230 F.3d at 460 ("The logic, purpose, and text of the Convention
all mean that such harms are not per se the type of psychological
harm contemplated by the narrow exception under article 13(b).
To conclude otherwise would risk substituting a best interest of
the child analysis for the analysis the Convention requires.
This would undercut the Convention's presumption of return where
rights of custody have been violated. . . .").

**IV.  <u>Summary</u>**

The Court is mindful that "[a] court that receives a
petition under the Hague Convention may not resolve the question
of who, as between the parents, is best suited to have custody of

the child.  With a few narrow exceptions, the court must return

the abducted child to its country of habitual residence so that

the courts of that country can determine custody." <u>Cuellar v.</u>

<u>Joyce</u>, 596 F.3d 505, 508 (9th Cir. 2010) (citations omitted).

Any matter concerning the welfare of children is of the utmost

importance.  This Court is dismayed by Petitioner's and

Respondent's testimonies about one another's behavior and urges

both to cultivate a civil environment in which to raise their

daughters.  The parental challenges that will no doubt arise as

their young daughters enter their teenage years and beyond will

be better weather in Petitioner and Respondent are not at odds

with one another.

Based on the current record, the Court FINDS that

Petitioner has established that: (1) the children were habitually

resident in the United Kingdom at the time of the retention; (2)

the retention was in breach of Petitioner's custody rights under

United Kingdom law; and (3) Petitioner was exercising those

rights at the time of retention.  Respondent has not sufficiently

established that there is a grave risk that the children's return

would expose them to physical or psychological harm or otherwise

place them in an intolerable situation, pursuant to article

13(b).

**<u>CONCLUSION</u>**

Based on the foregoing, the Court GRANTS Petitioner

Christopher Oddy's Emergency Verified Petition for Return of Children to the United Kingdom Pursuant to 42 U.S.C. § 11601, filed November 29, 2011.  Petitioner is granted until **March 13, 2012** to file a motion for attorneys' fees and reasonable costs pursuant to 42 U.S.C. § 11607.

   IT IS SO ORDERED.

   DATED AT HONOLULU, HAWAII, February 10, 2011.



   /s/ Leslie E. Kobayashi
   Leslie E. Kobayashi
   United States District Judge

**CHRISTOPHER ODDY V. JAHNA MORRIS**; CIVIL NO. 11-00715 LEK-KSC;
**ORDER GRANTING EMERGENCY VERIFIED PETITION FOR RETURN**
**OF CHILDREN TO THE UNITED KINGDOM PURSUANT TO 42 U.S.C. § 11601**

22